**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 21-5195**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

MATTHEW D. GREEN, et al.,

Plaintiffs-Appellants,

v.

UNITED STATES DEPARTMENT OF JUSTICE, et al.,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLEES**

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

SCOTT R. McINTOSH
DANIEL TENNY
  *Attorneys, Appellate Staff
  Civil Division, Room 7215
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-1838*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

The appellants in this Court, who were plaintiffs in the district court, are Matthew Green, Andrew Huang, and Alphamax LLC.  The appellees in this Court, who were defendants in the district court, are the U.S. Department of Justice, the Library of Congress, the U.S. Copyright Office, Carla Hayden in her official capacity as the Librarian of Congress, Shira Perlmutter in her official capacity as Register of Copyrights and Director of the U.S. Copyright Office, and Merrick B. Garland in his official capacity as Attorney General of the United States.  There were two amicus briefs in district court, both in support of defendants: one by Digital Content Protection, LLC; Intel Corporation; Advanced Access Content System Licensing Administrator, LLC; and DVD Copy Control Association, and a second by the Association of American Publishers, Inc.; the Entertainment Software Association; the Motion Picture Association, Inc.; and the Recording Industry Association of America, Inc.

In this Court, there have been three amicus briefs in support of appellants. One was on behalf of the National Association for the Deaf; the National Federation of the Blind; the Perkins School for the Blind; Public Knowledge; SecuRepairs.org; Telecommunications for the Deaf and Hard of Hearing, Inc.; the American Council for the Blind; the American Foundation for the Blind; the American Library Association; the Association of College and Research Libraries; the Association of Late-Defeaned Adults; the Association of Research Libraries; the Association of Transcribers & Speech-To-Text Providers; the Association on Higher Education and Disability; The Repair Association; iFixit; J. Alex Halderman; and Steven M. Bellovin. A second was on behalf of Kartemquin Educational Films and International Documentary Association. The third was on behalf of Rebecca Tushnet and Pamela Samuelson.

**B.     Rulings Under Review**

The ruling under review is the memorandum opinion and accompanying order denying plaintiffs' motion for a preliminary injunction, issued on July 15, 2021, by Judge Emmet G. Sullivan, docket

numbers 51 and 52 [JA 1730, 1731]. That opinion is not published.

Plaintiffs' notice of appeal also invokes an earlier order, entered June 27,

2019, docket number 24 [JA 801]. That order accompanied a published

opinion entered the same day, docket number 25, *Green v. U.S. Dep't of*

*Justice*, 392 F. Supp. 3d 68 (D.D.C. 2019) [JA 803].

## C. Related Cases

This matter has not previously been before this Court or any other

court. We are unaware of any related cases pending in this Court or any

other court.

*s/ Daniel Tenny*
Daniel Tenny

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................... 1

STATEMENT OF JURISDICTION ..................................... 2

STATEMENT OF THE ISSUE ............................................ 2

PERTINENT STATUTES AND REGULATIONS.............................................. 3

STATEMENT OF THE CASE................................................ 3

    A.    Statutory Background ...................................................3

    B.    Facts and Prior Proceedings...............................................9

SUMMARY OF ARGUMENT ............................................ 17

STANDARD OF REVIEW ................................................. 20

ARGUMENT...................................................................... 20

I.    The district court correctly rejected plaintiffs' First Amendment challenge to the Digital Millennium Copyright Act............................ 20

    A.    The challenged provisions advance the government's interest in preventing piracy and fostering the development of a market for digital works...................................21

    B.    The challenged provisions promote free expression and any adverse effect on speech is incidental and amply justified..............................................................................24

    C.    Plaintiffs significantly understate the Act's value and overstate its adverse effect on protected speech.........................29

1.  Preexisting remedies for copyright infringement do not render the statute unnecessary. ....................................30

2.  Plaintiffs' proposed activities illustrate the statute's limited effect on protected speech. ......................................36

D.  The Act's exemptions serve First Amendment interests. ...........41

E.  Plaintiffs do not advance their argument by invoking the speech of third parties not before the court. ................................48

II.  The statute does not create an exception for circumvention associated with fair use. .............................................................. 49

III.  The district court did not abuse its discretion in denying a preliminary injunction. ............................................................ 54

CONCLUSION .................................................................................... 55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                           **Page(s)**

*American Civil Liberties Union of Ill. v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012)..................................................................................26

*Animal Legal Def. Fund v. Kelly*,
  9 F.4th 1219 (10th Cir. 2021), *petition for cert. filed*,
  No. 21-760 (U.S. Nov. 22, 2021).............................................................................26

*Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982) ..............................................................................................26

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ..............................................................................................36

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
  381 F.3d 1178 (Fed. Cir. 2004)...................................................................... 52, 53

*Davis v. Pension Benefit Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ............................................................................20

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017)................................................................................39

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003) ...................................................................................... 27, 43

*First Nat'l Bank of Bos. v. Bellotti*,
  435 U.S. 765 (1978) ..............................................................................................26

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ..............................................................................................24

*Houchins v. KQED, Inc.*,
  438 U.S. 1 (1978) ..................................................................................................27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
387 F.3d 522 (6th Cir. 2004) ..................................................... 53, 54

*Los Angeles Police Dep't v. United Reporting Publ'g Corp.,*
528 U.S. 32 (1999) .................................................................27

*MDY Indus. v. Blizzard Entm't, Inc.,*
629 F.3d 928 (9th Cir. 2010) ..................................................... 31, 54

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) .................................................................29

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011) .................................................................26

*Thomas v. Chicago Park Dist.,*
534 U.S. 316 (2002) .................................................................47

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.,*
307 F. Supp. 2d 1085 (N.D. Cal. 2004) ............................................30

*Travis v. Reno,*
163 F.3d 1000 (7th Cir. 1998)......................................................27

*United States v. Elcom, Ltd.,*
203 F. Supp. 2d 1111 (N.D. Cal. 2002) ............................................30

*United States v. O'Brien,*
391 U.S. 367 (1968) ................................................................ 29, 30

*United States v. Williams,*
553 U.S. 285 (2008) .................................................................48

*Universal City Studios, Inc. v. Corley,*
273 F.3d 429 (2d Cir. 2001)......................................... 13, 14, 21, 25, 28, 30, 51

*Universal City Studios, Inc. v. Reimerdes,*
111 F. Supp. 2d 294 (S.D.N.Y. 2000), *aff'd sub nom.*
*Universal City Studios, Inc. v. Corley,*
273 F.3d 429 (2d Cir. 2001) ...............................................53

*Washington State Grange v. Washington State Republican Party,*
552 U.S. 442 (2008) ...............................................48

**Statutes:**

Administrative Procedure Act,
5 U.S.C. § 702...............................................2

Copyright Act:
17 U.S.C. § 106...............................................31
17 U.S.C. § 107........................................ 7, 43, 44
17 U.S.C. § 107(4)...............................................7

Digital Millennium Copyright Act:
17 U.S.C. § 1201(a)(1) ........................ 6, 10, 22, 25
17 U.S.C. § 1201(a)(1)(A) ...............................................31
17 U.S.C. § 1201(a)(1)(B) ...............................................51
17 U.S.C. § 1201(a)(1)(C) ........................ 7, 42, 43, 47
17 U.S.C. § 1201(a)(1)(C)(ii)-(iii) ...............................................43
17 U.S.C. § 1201(a)(2) ........................ 8, 10, 15, 22, 37, 40
17 U.S.C. § 1201(a)(3) ...............................................49
17 U.S.C. § 1201(a)(3)(a) ...............................................50
17 U.S.C. § 1201(b) ........................ 8, 22, 54
17 U.S.C. § 1201(c) ...............................................50
17 U.S.C. § 1201(d) ...............................................6
17 U.S.C. § 1201(e) ...............................................6, 8
17 U.S.C. § 1201(f) ........................ 6, 8, 41
17 U.S.C. § 1201(g) ........................ 6, 8, 41
17 U.S.C. § 1201(i) ...............................................6
17 U.S.C. § 1201(j) ........................ 6, 8, 41

28 U.S.C. § 1292(a)(1) ..........................................................2

28 U.S.C. § 1331..................................................................2

**Regulations:**

37 C.F.R. § 201.40(b)(16) ....................................................38

**Rules:**

Fed. R. App. P. 4(a)(1)(B)....................................................2

**Legislative Materials:**

H.R. Rep. No. 105-551, pt. 2 (1998) ....................................51

S. Rep. No. 105-190 (1996) ................................... 3, 4, 31, 50

WIPO Copyright Treaty, art. 11, Apr. 12, 1997,
    S. Treaty Doc. No. 105-17, 1997 WL 447232 ....................3

**Other Authorities:**

Final Rule, *Exemption to Prohibition on Circumvention of Copyright
    Protection Systems for Access Control Technologies*,
    83 Fed. Reg. 54,010 (Oct. 26, 2018).......................... 45, 46

Joshua P. Friedlander & Matthew Bass, Recording Indus.
    Ass'n of Am., *Year-End 2021 RIAA Revenue Statistics*,
    https://www.riaa.com/wp-content/uploads/2022/03/2021
    -Year-End-Music-Industry-Revenue-Report.pdf................... 33-34

*iTunes Store and DRM-Free Music: What You Need to Know*,
    Macworld (Jan. 7, 2009, 4:16 AM),
    www.macworld.com/article/194315/drm-faq-html .................33

U.S. Copyright Office, Library of Congress, *Section 1201 of Title 17:*
    *A Report of the Register of Copyrights* (June 2017) ...................... 4, 9, 23, 24, 33

U.S. Copyright Office, Library of Congress, *Section 1201 Rulemaking:*
    *Seventh Triennial Proceeding to Determine Exemptions to the*
    *Prohibition on Circumvention, Recommendation of the Acting*
    *Register of Copyrights* (Oct. 2018) ............................................................ 35, 39

U.S. Copyright Office, Library of Congress, *Section 1201 Rulemaking:*
    *Sixth Triennial Proceeding to Determine Exemptions to the*
    *Prohibition on Circumvention, Recommendation of the Register*
    *of Copyrights* (Oct. 2015) ...................................................................................45

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| MTD Op. | Memorandum Opinion on Motion to Dismiss |
| PI Op. | Memorandum Opinion Denying Preliminary Injunction |
| PI Opp'n | Memorandum in Opposition to Motion for Preliminary Injunction |

# INTRODUCTION

This is a First Amendment challenge to the Digital Millennium Copyright Act. The Act restricts the circumvention of technological protection measures that prevent unauthorized access to copyrighted works and trafficking in the means of enabling such circumvention. Since the Act's enactment, the market for digital copyrighted works has exploded, with music, television shows, movies, books, and other types of expressive works widely disseminated in digital formats that provide only authorized users the means to access the works. The Act's restrictions have played an important role in facilitating the development of this expressive market by allowing content providers to authorize consumers and others to access their works in new and innovative ways while maintaining protections against massive piracy.

Despite the Act's significant salutary role in fostering expressive activity, plaintiffs claim that the Act violates the First Amendment. In addition to dramatically understating the Act's value in promoting the marketplace for expressive works in digital format, plaintiffs greatly overstate the degree to which it may restrict expression. The statute is focused on conduct rather than speech, restricting the use of technological

means to obtain unauthorized access to digital content.  Just as there is no

First Amendment right to break into a bookstore to read a book, there is no

First Amendment right to breach a paywall to access online content

without paying for it.  And the statute contains numerous safeguards that

further limit even its indirect effect on protected speech.

The district court properly denied plaintiffs' motion for a preliminary

injunction, and its judgment should be affirmed.

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C.

§ 1331, raising constitutional claims and claims under the Administrative

Procedure Act, 5 U.S.C. § 702.  The district court denied a preliminary

injunction on July 15, 2021.  *See* Order [JA 1730].  Plaintiff timely appealed

on September 10, 2021.  *See* Notice of Appeal [JA 1763]; Fed. R. App. P.

4(a)(1)(B) (60-day time limit).  This Court has jurisdiction under 28 U.S.C.

§ 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether provisions of the Digital Millennium Copyright Act that

restrict circumvention of technological measures that protect access to

copyrighted works and trafficking in the means to circumvent those measures are consistent with the First Amendment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Digital Millennium Copyright Act was enacted in 1998 to promote the digital dissemination of copyrighted works.  The statute was designed to implement the World Intellectual Property Organization Copyright Treaty and the World Intellectual Property Organization Performances and Phonograms Treaty, each of which was aimed at protecting the rights of copyright owners to control access to creative works when those works are disseminated digitally.  *See* S. Rep. No. 105-190, at 2 (1996).  In particular, the Copyright Treaty requires contracting states to "provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors" to protect their rights.  *See* WIPO Copyright Treaty, art. 11, Apr. 12, 1997, S. Treaty Doc. No. 105-17, 1997 WL 447232, at *8.

The treaty and implementing legislation were necessary because while the possibility of distributing copyrighted works digitally held great promise, it also posed significant risks for copyright owners.  "[T]he same features that make digital technology a valuable delivery mechanism—the ability to quickly create and distribute near-perfect copies of works on a vast scale—also carry the potential to enable piracy to a degree unimaginable in the analog context."  U.S. Copyright Office, Library of Congress, *Section 1201 of Title 17: A Report of the Register of Copyrights* i (June 2017) ("Section 1201 Report") [JA 610].  Congress recognized that "[d]ue to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy."  S. Rep. No. 105-190, at 8.

The Act is designed to support technological protection measures that industry has developed to address these concerns.  Many of these measures are familiar to anyone who accesses any form of digital content.  Subscription services are protected by passwords, such that users cannot access digital content ranging from news articles to music to television

4

shows and movies without obtaining authorization from the content provider. Other technological protection measures operate to allow copyright owners to limit access to or dissemination of works that are obtained lawfully, such as by limiting the period during which a rented movie will be available, protecting copyrighted software embedded in consumer products, or preventing unauthorized copying of digital works.

But technology alone could not resolve the problem: the industry recognized that "an experienced and well-resourced hacker could ultimately defeat any protection system." Traw Decl. ¶ 8 [JA 1612]. Such hacking could both allow unauthorized users to access digital works and facilitate the creation of perfect unencrypted digital copies that "would further allow mass distribution of unprotected infringing copies." *Id.* The industry thus sought legal protection to make such hacking unlawful, both through international treaties by the World Intellectual Property Organization and through domestic law in the form of the Digital Millennium Copyright Act. *Id.* ¶ 8 [JA 1612-13].

The Act functions by imposing new restrictions on the circumvention of technological protection measures, and on trafficking in tools to do so. The statute prohibits "circumvent[ing] a technological measure that

5

effectively controls access to a work protected under [the Copyright Act]."
17 U.S.C. § 1201(a)(1). That prohibition is subject to a number of
exemptions, some created by statute and others to be determined by the
Librarian of Congress in rulemaking proceedings.

The statute provides exemptions for nonprofit libraries, archives, or
educational institutions that wish to gain access to a work to determine
whether to acquire a copy of it, 17 U.S.C. § 1201(d); for law-enforcement,
intelligence, and other government activities, *id.* § 1201(e); for certain
efforts to analyze the technological protection measure to achieve
interoperability with other programs, *id.* § 1201(f); for encryption research,
*id.* § 1201(g); for the purpose of identifying and disabling a technological
protection measure's ability to collect or disseminate personally identifiable
information, *id.* § 1201(i); and for security testing, *id.* § 1201(j).

The statute also directs the Librarian of Congress, upon the
recommendation of the Register of Copyrights, to determine in a
rulemaking proceeding conducted every three years "whether persons
who are users of a copyrighted work are, or are likely to be in the
succeeding 3-year period, adversely affected by the prohibition [on
circumvention] in their ability to make noninfringing uses . . . of a

particular class of copyrighted works."  17 U.S.C. § 1201(a)(1)(C).  In

making that determination, the Librarian is required to examine (i) "the

availability for use of copyrighted works"; (ii) "the availability for use of

works for nonprofit archival, preservation, and educational purposes";

(iii) the circumvention prohibition's impact "on criticism, comment, news

reporting, teaching, scholarship, or research"; (iv) "the effect of

circumvention of technological measures on the market for or value of

copyrighted works"; and (v) "such other factors as the Librarian considers

appropriate."  *Id.*  To the extent that these factors direct the Librarian to

focus on particular uses of works, they parallel the provision of the

Copyright Act that codifies a fair-use defense to copyright infringement.

*See id.* § 107 (stating that the "fair use of a copyrighted work . . . for

purposes such as criticism, comment, news reporting, teaching (including

multiple copies for classroom use), scholarship, or research[] is not an

infringement of copyright" and requiring, in determination whether use is

fair, consideration of whether use "is of a commercial nature or is for

nonprofit educational purposes"); *see also id.* § 107(4) (requiring

consideration of "the effect of the use upon the potential market for or

value of the copyrighted work").

In addition to the prohibition on circumvention of technological protection measures, Congress placed limits on the dissemination of tools designed to accomplish such circumvention.  Congress prohibited the "manufacture, import, offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof" that is either "primarily designed or produced for the purpose of circumventing" a technological measure protecting access to copyrighted works, "has only limited commercially significant purpose or use other than" circumventing such measures, or "is marketed . . . for use in circumventing" such measures.  17 U.S.C. § 1201(a)(2).  A materially identical set of restrictions, not challenged here, also applies to tools designed to circumvent protection afforded by a technological measure that protects a right of a copyright owner, such as the rights to make or authorize reproductions, distributions, or public performances.  *Id.* § 1201(b).  The trafficking prohibitions are subject to a more limited set of exemptions than the circumvention prohibitions, with exemptions for law-enforcement, intelligence, and other government activities, *id.* § 1201(e); certain reverse engineering, *id.* § 1201(f); certain research activities, *id.* § 1201(g); and certain security testing, *id.* § 1201(j).  The Librarian of

Congress is not authorized to create additional exemptions from the trafficking prohibitions.

In the wake of the Act's enactment, digital dissemination of copyrighted works has dramatically increased. In addition to many works being made available in digital form through physical media like DVDs, works are made available for download over the Internet, and streaming services have developed that allow users to listen to or view copyrighted works over the Internet without licensing a separate copy of the digital work for download. *See* Section 1201 Report ii [JA 611]. Digital content providers credit the Act's protections for allowing these markets to develop, thus providing greater access to creative works. *Id.*

**B.    Facts and Prior Proceedings**

1. Plaintiffs are Matthew Green, a professor at the Johns Hopkins Information Security Institute; Andrew "bunnie" Huang, an "electrical engineer, inventor, and owner of several small businesses"; and Alphamax, LLC, a company owned by Huang that "develops audiovisual media technology." Compl. ¶¶ 5-7 [JA 15].

Green alleges that his work involves analyzing the security of computer systems, which he asserts that he can only do if he bypasses the

technological protection measures that prevent access to the secure software code.  Green Decl. ¶ 9 [JA 909].  He asserts that he communicates with others about his work, including by sharing computer code that he has written.  *Id.* ¶¶ 11-12 [JA 910].  And he claims to be writing an academic book "to instruct readers in the methods of security research," which will include "examples of code capable of bypassing security measures."  *Id.* ¶ 20 [JA 912-13].

Green initially asserted that the anti-circumvention provision in 17 U.S.C. § 1201(a)(1) threatened his ability to bypass security measures, and that the anti-trafficking provision in 17 U.S.C. § 1201(a)(2) threatened his communications.  Green Decl. ¶¶ 27, 29 [JA 915].  During the preliminary-injunction briefing, however, plaintiffs acknowledged that an exemption created in the Librarian's 2018 rulemaking "will allow Dr. Green to circumvent [technological protection measures] in furtherance of his research," and stated that "Dr. Green is therefore not seeking to preliminarily enjoin the Government's enforcement of Section 1201(a)(1) against him."  Mem. in Support of Mot. for Prelim. Inj. 14 [JA 887]; *see also* Mem. Op. Denying Prelim. Inj. (PI Op.) 14 n.4 [JA 1744 n.4] (noting that "Dr. Green does not seek injunctive relief with regard to his anti-

circumvention claim because he received an exemption in the 2018 Rulemaking"). Green thus sought a preliminary injunction only with regard to the provision that prohibits trafficking in tools that circumvent access controls.

Huang alleges that he has invented a device that allows users to save and manipulate video content, but that he would like to modify the device's functionality to allow it to access and manipulate original video content that is protected by an access-control measure called High-bandwidth Digital Content Protection. Huang Decl. ¶ 6 [JA 924-25]. High-bandwidth Digital Content Protection has become the industry standard, and operates to protect content when it is temporarily decrypted to enable viewing. *See* Balogh Decl. ¶¶ 4-5 [JA 1618-19]. Because Huang proposes to circumvent the only protection that audiovisual works typically have when they are transmitted to standard display devices for viewing, Huang seeks to market a device that effectively circumvents the protection on virtually all digital audiovisual content. *Id.* The Act generally prohibits such devices from being used or sold on the open market.

Huang claims that but for the statutory restrictions at issue here, his device would have better functionality, including allowing the creation of

"socially valuable and noninfringing expression."  Huang Decl. ¶¶ 12-13 [JA 926-27].  He asserts that if the statutory restrictions were lifted, in addition to selling a new device, he would publish computer code that would allow customers to upgrade their existing devices and inform others about how the technology works.  *Id.* ¶ 16 [JA 928].

2.  Plaintiffs filed this suit and then, two months later, the government moved to dismiss the complaint and Green simultaneously sought a preliminary injunction.  The district court resolved the motion to dismiss first, granting it in part and denying it in part.  The court concluded, in rulings not at issue here, that plaintiffs had standing and that their Administrative Procedure Act challenge to the triennial rulemaking proceedings should be dismissed because the Library of Congress is not an "agency" under the APA.  Mem. Op. on Mot. to Dismiss (MTD Op.) 13-22, 51-61 [JA 815-24, 853-63].  As relevant here, the district court dismissed plaintiffs' facial-overbreadth claim and their prior-restraint claim, but denied the motion to dismiss on their as-applied claims.

As an initial matter, the district court held that plaintiffs had adequately alleged that their First Amendment interests were implicated, both because the computer code that they seek to publish has some

expressive components and because they wish to engage in other activities that implicate the First Amendment.  MTD Op. 23-28 [JA 825-30].  But the court concluded that they could not raise a facial-overbreadth challenge because they did not identify any significant difference between their own claims and those that third parties might bring, rendering an overbreadth analysis unnecessary.  *Id.* at 29-32 [JA 831-34].

The district court rejected plaintiffs' argument "that the triennial exemption process is a speech-licensing regime."  MTD Op. 32 [JA 834].  The court held that the rulemaking did not involve "censorship based on what [plaintiffs] want to express, their viewpoint, or who they are."  *Id.* at 35 [JA 837].  Instead, decisions are made based on "whether the type of proposed use is in fact noninfringing under copyright law."  *Id.* at 36 [JA 838] (quoting government's reply brief).

Turning to plaintiffs' as-applied challenge, the court concluded that the restrictions at issue here are content-neutral, and thus are subject to intermediate scrutiny, because they "target[] only the non-speech component" of plaintiffs' desired activity.  MTD Op. 39 [JA 841].  Agreeing with the Second Circuit's decision in *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001), which had upheld the provisions at issue here

against a First Amendment challenge, the court explained that the statute targeted the functional aspects of computer code used to circumvent a technological protection measure and was not concerned with "whatever capacity [the code] might have for conveying information to a human being."  MTD Op. 40 [JA 842] (quoting *Corley*, 273 F.3d at 454).

The court noted that plaintiffs conceded that the statute was "aimed at furthering a substantial interest and that that interest is unrelated to the suppression of free expression."  MTD Op. 47 [JA 849].  But the court held that the as-applied First Amendment claim could not be dismissed at the pleading stage because "none of the facts supporting the asserted risks identified by the government" were in the record, and the record thus did not permit the government to demonstrate that the statute "does not burden substantially more speech than is necessary to further the government's legitimate interests."  *Id.* at 50 [JA 852] (quotation marks omitted).

3.  The district court subsequently denied a renewed request for a preliminary injunction on behalf of both plaintiffs.  The court first held that no injunctive relief would be granted as to claims that the court had dismissed.  PI Op. 13 [JA 1743].  The court also rejected plaintiffs' invitation

to construe the anti-circumvention provision to apply only when the use of the copyrighted work was infringing, on the ground that plaintiffs' reading was inconsistent with the statute. *Id.* at 13-14 [JA 1743-44].

The court rejected Green's challenge to the anti-trafficking provision on the ground that his planned publication of an academic work would not implicate the trafficking provision because it would be designed for academic research rather than for the purpose of circumvention. PI Op. 16-17 [JA 1746-47] (citing 17 U.S.C. § 1201(a)(2)).

The court also rejected the argument that the Act's application to Huang and Alphamax violated the First Amendment. Although the government had "a compelling argument that the code as used in the . . . device Dr. Huang wants to create, use and distribute does not qualify as speech entitled to First Amendment protection," the court did not "resolve that question" because the statute's application satisfied intermediate scrutiny in any event. PI Op. 18 [JA 1748]. The court rejected plaintiffs' request that the court revisit its prior determination that plaintiffs had not contested the government's substantial interest, and also noted that the government had cited evidence about the statute's success in preventing

piracy and allowing the development of new technologies.  *Id.* at 20-21 [JA 1750-51].

As to whether the restriction burdened substantially more speech than necessary, the court observed that the government pointed to admissible evidence (or evidence subject to judicial notice) demonstrating that Huang's device would allow unrestricted access to video content offered by subscription and on-demand services, as well as content on DVDs, Blu-ray discs, and Ultra HD discs.  PI Op. 22-23 [JA 1752-53].  Such access would defeat virtually all video content delivery protection systems. *Id.* at 23 [JA 1753].  Conversely, many of the things Huang attempts to achieve through his device can be done through other lawful means.  *Id.* at 24 [JA 1754].  The court noted that the Register of Copyrights had concluded in the rulemaking proceeding that there was an inadequate record to determine whether Huang's desired uses would constitute fair use, and held that Huang's submissions in court were likewise inadequate to support his related argument that the statute was unconstitutional as applied to his proposed circumvention for the purpose of facilitating such uses.  *Id.* at 25-26 [JA 1755-56].

The court rejected plaintiffs' argument that remedies for copyright infringement were sufficient to serve the government's interests. The court noted that the Digital Millennium Copyright Act was "enacted specifically to address the challenges posed by the Internet and digital content." PI Op. 28 [JA 1758].

Having concluded that plaintiffs could not demonstrate a likelihood of success on the merits, the court further explained that plaintiffs' claims of irreparable harm—which were premised on First Amendment harm— and on the balance of equities likewise fell short. PI Op. 29-32 [JA 1759-62].

## SUMMARY OF ARGUMENT

The district court properly denied a preliminary injunction that would undermine the Digital Millennium Copyright Act's protections for digital copyrighted content. The Act fosters the development of a market for digital works by ensuring that content providers can market copyrighted works in digital form and depend on technological protection measures to prevent unauthorized access or copying. The Act does this by prohibiting the circumvention of technological protection measures that control access to copyrighted works, and by preventing trafficking in the means to circumvent such access controls or to circumvent technological

measures that protect a right of a copyright owner such as by preventing unauthorized copying. Such protections are especially important in the digital age, where perfect copies can be widely disseminated with the click of a button.

Plaintiffs' challenges to the Act are largely premised on their view that preexisting copyright laws were sufficient to protect copyrighted works in the digital marketplace, and that the Act impermissibly inhibits their speech. Both assertions are incorrect.

While the Act reinforces the infringement provisions of the Copyright Act, it also fills an important gap in prior protections for copyrighted works. Traditionally, the Copyright Act's prohibitions on unauthorized copying, distribution, and public performances or displays, together with laws that prohibit unauthorized access to physical property, were sufficient to prevent unauthorized persons from accessing copyrighted works. In the digital age, however, these protections are insufficient, as access to copyrighted works is frequently restricted by technological protection measures whose circumvention allows access without necessarily violating one of these preexisting laws.

Relatedly, plaintiffs ignore that the statute does not restrict expression, but rather restricts circumventing technological protection measures to access copyrighted works without authorization. Obtaining such access is not itself expressive, any more than breaking into a bookstore to read a book is an expressive act. And as the Supreme Court has emphasized, measures that promote the economic viability of marketing creative works promote First Amendment values. Any adverse effects on expression are incidental and amply justified.

The provision authorizing the Librarian of Congress to create exemptions to the anti-circumvention provision for categories of circumvention that facilitate noninfringing uses does not render the statute constitutionally suspect. Rather, the creation of exemptions advances First Amendment interests. As plaintiffs emphasize, the fair-use doctrine in copyright law promotes First Amendment interests by allowing the creation of expressive works. The Librarian's creation of exemptions after considering factors parallel to those relevant to a fair-use inquiry raises no First Amendment concern.

Finally, plaintiffs are mistaken to suggest that the statute should be construed only to apply when circumvention facilitates copyright

infringement. Congress created a new set of rights to prevent

unauthorized access, separate from the rights already protected by

preexisting copyright laws. And the exemption scheme would make no

sense if all noninfringing uses were already exempt. The statute should be

applied according to its terms, allowing copyright owners to prevent

unauthorized access to their works and thus preserving their economic

incentive to create and disseminate works in digital mediums.

## STANDARD OF REVIEW

This Court reviews the district court's denial of a preliminary

injunction for abuse of discretion, while reviewing the district court's legal

conclusions de novo. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288,

1291 (D.C. Cir. 2009).

## ARGUMENT

## I. The district court correctly rejected plaintiffs' First Amendment challenge to the Digital Millennium Copyright Act.

The challenged provisions of the Digital Millennium Copyright Act

are fully consistent with the First Amendment. The Act's provisions serve

the important goal of protecting digital works from piracy and promoting

the development of a marketplace for such works. The Act thus promotes,

rather than restricts, the marketplace of ideas. And the Act does so by restricting conduct; to the degree that provisions of the Act have the effect of limiting speech in certain circumstances, that effect is incidental and readily justified. The Second Circuit thus correctly upheld the relevant provisions of the Act as applied in *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001). The same result should obtain here.

### A. The challenged provisions advance the government's interest in preventing piracy and fostering the development of a market for digital works.

As the district court recognized—and plaintiffs appeared to concede at one point in this proceeding—the Act advances the government's interest in protecting digital works from piracy and thus allowing the development of a marketplace for digital works. PI Op. 20-21 [JA 1750-51]. The problem that Congress faced was that creators and distributors of expressive works were hesitant to provide their works in digital form because of the ease with which perfect copies of digital works can be made and disseminated. The market for digital copies of copyrighted works depended on a secure system of distributing digital works that provided protection against unauthorized access and copying. Traw Decl. ¶ 3 [JA 1611].

Technologically, the industry created means of protecting digital content against unauthorized access and copying. Without these measures, disseminating digital works in any form—whether on physical media such as a DVD, through downloads over the Internet, or by allowing access to works by subscription without transmitting a permanent copy to the consumer—would risk widespread unauthorized access and copying. These technological solutions would not work, however, if people were at liberty to circumvent the technological protections in order to obtain unauthorized access to works or in order to make unauthorized copies. In keeping with the global effort to foster the digital marketplace, Congress therefore prohibited the circumvention of these sorts of technological protection measures, and the dissemination of tools designed to circumvent them. The restrictions were designed to provide copyright owners with the assurance they needed that digital dissemination of copyrighted works would remain commercially viable.

In particular, Congress prohibited circumventing technological measures that protect access to a copyrighted work. 17 U.S.C. § 1201(a)(1). Because of this provision, it is unlawful to breach the paywall of an Internet site that provides access to music by subscription and listen to the songs for

free, or to rent a digital copy of a movie and then override the timing restriction and maintain access to the movie forever. Congress also restricted trafficking in tools to circumvent technological protection measures that control access to the work, *id.* § 1201(a)(2), and, in a provision not challenged here, tools to circumvent measures that limit copying and other rights protected by copyright law, *id.* § 1201(b). Because of these provisions, circumvention tools cannot be lawfully sold and are not available through mainstream retail channels.

In the decades since the Act's passage in 1998, the market for digital creative works has exploded. In the video industry, "DVDs, Blu-ray, and 4K Ultra HD Blu-ray discs compete with streaming services such as Hulu, Netflix, Amazon Instant Video, and Google Play," while "[i]n the music industry, the majority of revenues now come from streaming services like Spotify, Pandora, and Apple Music, displacing download revenues, which in turn previously displaced compact disc revenues." Section 1201 Report ii [JA 611]. In the field of computing, "cloud computing has become standard, and software as a service is now a leading licensing and delivery model for businesses and individuals." *Id.* All of these platforms depend on technological protection measures "to effectively operate in the

marketplace," and "[c]opyright owners also credit the statute's anti-trafficking provisions with keeping circumvention technologies out of the mainstream." *Id.*

## B. The challenged provisions promote free expression and any adverse effect on speech is incidental and amply justified.

As the above discussion illustrates, Congress designed the Act to promote expression by protecting the security of digital works, thus encouraging the creation and dissemination of such works. Like copyright law, which the Supreme Court has described as "the engine of free expression," the Act "supplies the economic incentive to create and disseminate ideas" by creating "a marketable right to the use of one's expression." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

Plaintiffs nonetheless challenge the Act on First Amendment grounds, arguing that the statute unduly impinges on their right to free speech. But while the Act's benefits in promoting expression in the digital marketplace are profound, the degree to which it inhibits speech is much less significant than plaintiffs suggest. As the district court properly recognized, any limitations on speech are incidental and easily justified.

1.  The Act's anti-circumvention provision prohibits circumventing technological protection measures that protect access to copyrighted works.  17 U.S.C. § 1201(a)(1).  That is fundamentally a restriction on conduct.  While creating digital content is an expressive act, accessing digital content is not: just as there is no constitutional right to break into a bookstore to read a book, there is no constitutional right to circumvent protections on digital works.  *See Corley*, 273 F.3d at 453 (comparing circumvention software to "a device that can neutralize the security device attached to a store's products").  Although certain limitations on access to information may indirectly affect the right of self-expression, that does not mean that laws restricting unauthorized access to information "are subject to the same degree of First Amendment scrutiny as those targeting the speech itself," as plaintiffs suggest, Appellants' Br. 22.  And that is so even if the statute is applied to people who seek to access creative works for the purposes of creating further creative works: the constitutionality of prohibitions on breaking into a bookstore does not depend on what the person intends to do with what he learns from the books.

The cases on which plaintiffs rely do not suggest otherwise.  Most of them merely discuss the importance of access to information in the context

of First Amendment challenges to restrictions on the dissemination of information. In *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978), for example, the Supreme Court analyzed a restriction on political expenditures of corporations, noting that commercial advertisements are constitutionally protected because they contribute to the availability of information. *Id.* at 783. In *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), the Supreme Court analyzed a restriction on which books would be made available in a school library. And in *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), the Supreme Court considered a restriction on the sale, disclosure, and use of pharmacy records for particular purposes. Finally, circuit courts have analyzed the First Amendment interests in the "creation of information," such as by videotaping, rather than merely accessing a creative work that already exists. *See Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021) (documenting abuse of animals), *petition for cert. filed*, No. 21-760 (U.S. Nov. 22, 2021); *American Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (recording police officers).

  None of these cases suggests that the mere act of obtaining unauthorized access to expressive works or information created or

recorded by others receives the same First Amendment protection as the act of creating an expressive work. *Cf. Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998) (holding that First Amendment did not require access to information in public records); *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978) (plurality opinion) ("This Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control."); *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 40 (1999) (rejecting facial First Amendment challenge to "a governmental denial of access to information in its possession"). To the contrary, as discussed above, it would be antithetical to First Amendment interests to dilute the commercial incentive to create expressive works by allowing them to be accessed without authorization. *See Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) (noting that "copyright's purpose is to *promote* the creation and publication of free expression" (emphasis in original)).

2. The prohibition on trafficking in tools that circumvent access controls, similarly, targets conduct and not speech. Manufacturing and selling the means to circumvent technological protection measures is not an expressive act. Just as selling lock picks is not an expressive act, even if

they might be used to break into a bookstore, selling the means to obtain unauthorized access to expressive works is not expressive.

In some circumstances, the means of circumvention may be a computer program distributed in a form that can be read by human beings (such as other computer programmers) and thus disseminating the program may convey information about how the circumvention works. But the applicability of the trafficking prohibition is not tied to the ability of software to convey programming information to human beings. Rather, as the Second Circuit recognized, the Act applies to circumvention software "solely because of its capacity to instruct a computer," and the software's "functional capacity is not speech within the meaning of the First Amendment." *See Corley*, 273 F.3d at 454. The Act is not "concerned with whatever capacity [the code] might have for conveying information to a human being, and that capacity . . . is what arguably creates a speech component of the . . . code." *Id.*

3. The district court was therefore correct to conclude that the Act is not a content-based restriction on speech subject to strict scrutiny. It does not "appl[y] to particular speech because of the topic discussed or the idea or message expressed," and to the extent that it may incidentally affect

speech, it is "justified without reference to the content of the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (quotation marks omitted). The district court properly applied the rule that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

### C. Plaintiffs significantly understate the Act's value and overstate its adverse effect on protected speech.

In district court, plaintiffs raised both facial and as-applied challenges to the Act's provisions prohibiting circumvention of technological protection measures that protect access to digital works and prohibiting trafficking in tools to achieve such circumvention. The district court granted the government's motion to dismiss plaintiffs' facial challenge, observing that it added little to plaintiffs' challenge to the statute as applied to their own proposed conduct. MTD Op. 29-32 [JA 831-34]. And the district court then denied a preliminary injunction based on plaintiffs' as-applied challenge, which plaintiffs now appeal.

As the district court recognized, given the substantial interests that the Act advances, the Act readily satisfies the intermediate scrutiny that applies to incidental limitations on First Amendment freedoms. *See O'Brien*, 391 U.S. at 377 ("[W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."). Other courts to entertain First Amendment challenges to the Act have reached the same conclusion. *See Corley*, 273 F.3d at 458; *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1103 (N.D. Cal. 2004); *United States v. Elcom, Ltd.*, 203 F. Supp. 2d 1111, 1132 (N.D. Cal. 2002). Plaintiffs' arguments to the contrary are unavailing.

### 1. Preexisting remedies for copyright infringement do not render the statute unnecessary.

As discussed above, the Act serves a substantial interest in protecting copyrighted works and promoting the development of a market for digital works. Plaintiffs seek to dismiss these interests as "generalized claims of

harm," premised on "private parties' supposed fears that [technological protection measures] and traditional copyright and other laws will be insufficient to deter unidentified third parties . . . from engaging in piracy." Appellants' Br. 34. But the Act provides a critical supplement to copyright laws in protecting the digital marketplace.

Copyright law restricts the copying, distribution, and public performance or display of copyrighted works, and the creation of derivative works. *See generally* 17 U.S.C. § 106 (describing exclusive rights associated with copyright ownership). The prohibition on circumvention, by contrast, prohibits the circumvention of "a technological measure that effectively controls *access* to a work." *Id.* § 1201(a)(1)(A) (emphasis added). "[P]rior to [the] Act, the conduct of circumvention was never before made unlawful." S. Rep. No. 105-190, at 12; *see also MDY Indus. v. Blizzard Entm't, Inc.*, 629 F.3d 928, 947 (9th Cir. 2010) ("[B]ypassing a password . . . in order to . . . view a copyrighted work would not infringe on any of the copyright owner's exclusive rights under § 106."). Nor indeed did the Copyright Act prohibit unauthorized access to copyrighted works. Restrictions on access to non-digital works were largely accomplished through other laws, such as those that prohibit the theft of physical objects. But because perfect

copies of works in digital form can proliferate without the transfer of physical objects, traditional laws against theft of physical objects have little if any purchase. This feature of digital works exposed a gap in the existing protections provided by prior laws, and new legislation was required to fill that gap.

In addition, the Act provides important reinforcement for copyright law's traditional prohibition on unauthorized copying. Making it unlawful to circumvent technological protection measures and thus obtain unprotected and easily distributable copies of a work without authorization is a natural way to inhibit the sort of mass unlawful copying that could stifle the market for digital works. The device that plaintiff Huang wishes to market illustrates the point. Huang seeks to circumvent High-bandwidth Digital Content Protection, *see* Huang Decl. ¶ 12 [JA 926], which protects digital audiovisual content when it is being transferred to the device on which it is viewed, such as a television screen, Balogh Decl. ¶ 4 [JA 1618]. Because the content provider's own protection measures must be disabled to allow the viewing device to access the content, Huang's proposed circumvention would allow unprotected access to virtually all otherwise-protected audiovisual works. The effect of Huang's

proposed device "would be to eviscerate virtually every single video content delivery protection system exposing valuable copyrighted video content to massive infringement."  Balogh Decl. ¶ 5 [JA 1619].

Plaintiffs dispute the continued value of technological protection measures head-on when they assert that "many online vendors of digital media have abandoned [technological protection measures] as unnecessary." Appellants' Br. 35.  But the 2009 article on which they rely stated that while some vendors of digital music had stopped encrypting their music, the same vendors had continued to encrypt their "copy-protected movies and TV shows."  *iTunes Store and DRM-Free Music: What You Need to Know*, Macworld (Jan. 7, 2009, 4:16 AM),[1] *cited in* Pls' Reply in Support of Mot. for Prelim. Inj. 15 [JA 1688].  And even as to music, plaintiffs' claim is outdated; most music is now obtained through streaming rather than downloads, and is thus protected by passwords or other technological protection measures.  *See* Section 1201 Report ii [JA 611]; Joshua P. Friedlander & Matthew Bass, Recording Indus. Ass'n of

---

[1] www.macworld.com/article/194315/drm-faq-html

Am., *Year-End 2021 RIAA Revenue Statistics*[2] 1 (streaming constituted 83%
of recorded music revenues in 2021). More generally, content providers
may use different strategies at different times and for different types of
content, but there is no dispute that providers of audiovisual works
continue to use the measures that Huang seeks to circumvent. Had they
ceased to do so, that aspect of this case would be moot.

Plaintiffs emphasize that the unauthorized copying of digital works
that could result from use of Huang's device would itself constitute
copyright infringement. *See, e.g.*, Appellants' Br. 36. But Congress
reasonably concluded that allowing content providers to ensure that their
digital works retained technological protections would limit unlawful
copying more effectively than the threat of infringement liability alone. An
unprotected digital work can be widely disseminated in the blink of an eye,
and Congress reasonably concluded that providers should be entitled to
protect the original rather than trying to chase down the copies.

Plaintiffs are mistaken to suggest that because the tools for
circumventing certain technological protection measures have become

---

[2] https://www.riaa.com/wp-content/uploads/2022/03/2021-Year-
End-Music-Industry-Revenue-Report.pdf

available on the Internet—while remaining illegal—the statute can have no

purpose because "it is illogical to conclude that those willing to break

copyright law to engage in infringement will be unwilling to break Section

1201(a)." Appellants' Br. 35. Not everyone who might make an

unauthorized copy using legal products would be willing to take the extra

step of obtaining black-market software to circumvent access protections.

Plaintiffs cite no evidence to support the counterintuitive proposition that

an additional barrier to copyright infringement has no deterrent effect, and

the industry's continued use of technological protection measures

demonstrates that they continue to regard them as worthwhile.

Huang supports his claims, moreover, by arguing that his device

would be used in ways that would be consistent with the fair-use doctrine,

a contention that the Acting Register of Copyrights deemed to be

inadequately substantiated. *See* U.S. Copyright Office, Library of Congress,

*Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions*

*to the Prohibition on Circumvention, Recommendation of the Acting Register of*

*Copyrights* 134 (Oct. 2018) ("Seventh Triennial Proceeding

Recommendation") [JA 1140]. The copyright owner's ability to prevent

Huang or his customers from creating an unauthorized, unprotected copy

under the guise of a claim of fair use is particularly important because the distinction between copyright infringement and fair use can be murky. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (noting that fair-use doctrine "calls for case-by-case analysis" and that "[t]he task is not to be simplified with bright-line rules").

### 2. Plaintiffs' proposed activities illustrate the statute's limited effect on protected speech.

On the other side of the ledger, the activities in which plaintiffs wish to engage illustrate that the challenged provisions affect speech only in incidental and very limited respects.

Plaintiff Green asserts that he wants to communicate with other software engineers and write an academic book. Green Decl. ¶¶ 11-12, 20 [JA 910, 912-13]. As the district court recognized, the statute's prohibition on trafficking in circumvention measures does not prohibit academic communications, but is instead limited to distribution of a "technology, product, service, device, component, or part thereof" that is "primarily designed or produced for the purpose of circumventing a technological measure" that controls access, whose only commercially significant use is

to circumvent technological access controls, or which is marketed as a circumvention tool.  17 U.S.C. § 1201(a)(2); *see* PI Op. 16-17 [JA 1746-47].

Writing and disseminating an academic work does not violate the statute, as the government explained and the district court agreed.  *See* Mem. in Opp'n to Mot. for Prelim. Inj. (PI Opp'n) 33-36 [JA 1596-99]; PI Op. 16-17 [JA 1746-47].  The government further pointed out in district court that the statute did not have a very significant effect on protected expression for the additional reason that it was unclear why an academic work—unlike a dissemination of computer code to be used for illicit purposes—would need to contain examples of circumvention code.  PI Opp'n 38-40 [JA 1601-03].  None of that discussion alters the fundamental point that the statute does not restrict the distribution of academic works like the one Green claims to want to publish.

In addition to publishing information and computer code regarding circumvention of access controls, Green wishes to engage in circumvention of such controls himself.  Green expressly waived the argument that he needs a preliminary injunction against the circumvention provision, because he received an exemption in the triennial rulemaking.  Mem. in Support of Mot. for Prelim. Inj. 14 [JA 887]; *see also* PI Op. 14 n.4 [JA 1744

n.4] (noting waiver); 37 C.F.R. § 201.40(b)(16) (current version of exemption after 2021 rulemaking).  But in any event, plaintiffs' suggestion that this circumvention constitutes speech fails for the reasons stated above—Green does not express anything merely by accessing content protected by a technological measure.

Even on its own terms, plaintiffs' argument is significantly overstated.  Plaintiffs complain that the statute "bars a person from reading a copyrighted work that they own, such as a lawfully acquired ebook or the software in a device they purchased."  Appellants' Br. 22.  It is unclear what plaintiffs mean when they state that the statute prohibits them from reading "a lawfully acquired ebook"; the content provider would not prohibit access to the book's contents by the lawful purchaser.  To the extent that plaintiffs claim a right to access the contents of the ebook on terms different from those authorized by the content provider, they merely illustrate how the Act promotes the digital marketplace: content providers can provide access to a work on limited terms, including for free or for a relatively low price for a limited time, but only if consumers cannot break the technological protection measures and obtain broader access.  Plaintiffs do not have a First Amendment right to broader access than they

bargained for.  *See* Seventh Triennial Proceeding Recommendation 123 [JA 1129] (noting that "DVDs and Blu-ray discs bundled in 'bonus packs,' which include access to a separate online or downloadable copy, are sold at a higher price point than is charged for just the disc by itself").

When plaintiffs complain about being prohibited from "reading . . . software in a device they purchased," they likewise presumably do not mean to suggest that they are prevented from reading software that the seller meant for users to read, as opposed to software that allows a device to function or limits access to a copyrighted work.  *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 863 (9th Cir. 2017) (noting distinction between authorization to access the work and authorization to circumvent encryption technology).  Congress reasonably declined to equate the sale of a device to relinquishing control over software that the user need not read in order to use the device as intended.  And as noted, in Green's particular case, the purposes for which he claims to need to read software are protected by an exemption in any event.

Plaintiff Huang, for his part, is largely affected by the statute insofar as it prohibits him from creating and marketing a device that circumvents technological protection measures.  As discussed above, such a device is

not itself expressive, and it is regulated because of its functional capabilities rather than based on the possibility that computer programmers will read the device's software. And like Green, Huang is permitted to communicate directly with other programmers, including by sharing computer code for purposes other than circumvention. *See* 17 U.S.C. § 1201(a)(2).

Plaintiffs also vastly overstate even the indirect effect of the Act on protected expression. Plaintiffs' assertion that Huang's technology "would facilitate a wide range of non-infringing speech" by those who would use his device, Appellants' Br. 10, ignores the district court's recognition that various lawful technologies provide similar functionality, *see* PI Op. 24 [JA 1754]. Plaintiffs continue to assert that Huang's technology "would enable users to display a live presidential debate along with text from a commentator's live blog, or display coverage from multiple sources at once," Appellants' Br. 10, without addressing the record evidence that "these functions can already be accomplished in multiple ways" without circumventing technological protection measures, such as by using "smart TVs," Balogh Decl. Ex. A at 2 [JA 1622]. *Compare* Appellants' Br. 10 (stating that Huang's technology would allow a "visual overlay that notifies homeowners when a door has opened"), *with* Balogh Decl. Ex. A at 3

40

[JA 1623] (noting that this "functionality is presently provided by several [multichannel video programming distributor] services, as well as by security companies like ADT").  In short, much of the expression that Huang claims to want to facilitate is available through other means; the difference is that the alternative technology does not allow "producing unprotected copies, which can readily be further copied and distributed across the Internet causing massive infringement."  Balogh Decl. ¶ 6 [JA 1620].

## D.    The Act's exemptions serve First Amendment interests.

Plaintiffs are mistaken to suggest that the Act's exemptions render it an impermissible content-based restriction on speech.  The statutory exemptions merely permit certain conduct that would otherwise be prohibited, and do not relate to the content of any expression.  For example, the Act contains an exemption applicable to circumvention of technological measures controlling access to portions of a lawfully obtained computer program "for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created program with other programs."  17 U.S.C. § 1201(f); *see also id.* § 1201(g) (encryption research); *id.* § 1201(j) (security testing).

Like the Act itself, this exemption does not address the ability to express a message, but rather authorizes computer programmers to use certain functionality for one purpose but not for other purposes. If the technological protection measures instead took the form of a physical lock on a mechanical device, and an exception to a prohibition on picking the lock were made for engineers trying to make that device work with a separate device, no conceivable First Amendment objection could be raised. The result should be no different in the digital sphere.

The statute's authorization for the Librarian of Congress to create additional exemptions likewise raises no First Amendment concern. The exemption process is designed to ensure that the Digital Millennium Copyright Act does not unduly limit the noninfringing use of copyrighted works, directing the Librarian of Congress to identify classes of users who are likely to be "adversely affected by the [circumvention provision] in their ability to make noninfringing uses . . . of a particular class of copyrighted works." 17 U.S.C. § 1201(a)(1)(C). By its terms, this provision limits the degree to which the statute has a negative (albeit indirect) effect on the sort of expression that plaintiffs claim to wish to promote.

Plaintiffs recognize that the fair-use doctrine serves as one of copyright law's "built-in First Amendment accommodations."  Appellants' Br. 45 (quoting *Eldred*, 537 U.S. at 219).  And as noted above, plaintiffs criticize the Digital Millennium Copyright Act for prohibiting conduct that might not violate the copyright laws.  But plaintiffs simultaneously argue that the inclusion of an exemption process that parallels the fair-use inquiry is constitutionally problematic.  It is not.

Plaintiffs argue that the exemption process "regularly privileges certain speakers, topics, and mediums of speech over others."  Appellants' Br. 38.  But the statute merely charges the Librarian with distinguishing "noninfringing uses" from other uses.  17 U.S.C. § 1201(a)(1)(C).  The factors the Librarian is directed to consider parallel the statutory factors pertinent to the fair-use inquiry under 17 U.S.C. § 107.  Plaintiffs' complaint that the Librarian is directed "to favor a particular list of subject matter, such as criticism, comment, news reporting, teaching, scholarship, or research," Appellants' Br. 28 (citing 17 U.S.C. § 1201(a)(1)(C)(ii)-(iii)), ignores that the fair-use provision provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research[] is not an infringement of

copyright," 17 U.S.C. § 107.  If the fair-use provision itself—which has been characterized as a First Amendment virtue, not a vice—does not constitute impermissible content discrimination, the Librarian's consideration of the same criteria for similar purposes can hardly be condemned on that ground.

The dismissal of plaintiffs' challenge to the Librarian of Congress's selection of exemptions in rulemaking proceedings is not at issue in this appeal, and any quibble with the Librarian's case-specific determinations provides no basis for striking down the statute as unconstitutional.  To the extent those determinations are relevant here, they merely illustrate plaintiffs' error in equating the application of the fair-use factors with impermissible content discrimination.

For example, the creation of an exemption for "'documentary' film" but not for "'narrative' film," Appellants' Br. 29, was based on analysis provided by the Register of Copyrights of the statutory fair-use factors.  As the Register explained, "the use of motion picture clips in narrative films diverges from educational uses and uses in documentaries because there is no presumption that their primary purpose is to offer criticism or commentary, as opposed to being included for entertainment purposes."

U.S. Copyright Office, Library of Congress, *Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights* 79 (Oct. 2015) [JA 182].  Unlike with documentaries or educational use, a concern arises "that copyrighted works will be used in a manner that may supplant the existing, robust licensing market for motion picture clips."  *Id.*  Applying the familiar fair-use factors in this context promotes, rather than diminishes, First Amendment interests.

Similarly, the denial of an exemption for Huang was based on a careful review of the record, which "lacked the requisite detail and legal support for the Acting Register to conclude that the proposed uses are or are not likely to be noninfringing," or to conclude that the exemption's value would outweigh the "negative effect on the market for or value of copyrighted works."  Final Rule, *Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 83 Fed. Reg. 54,010, 54,027 (Oct. 26, 2018) [JA 998].  The conclusion that the negative effect of denying an exemption was "*de minimis*" was premised on the observation that the request "was largely made upon a single request of an individual who resides in Singapore for which there appeared to be myriad

alternative ways to achieve the proposed uses." *Id.* at 54,027-28 [JA 998-99].

As discussed above, plaintiffs do not meaningfully respond to these

deficiencies in the evidentiary support for Huang's need for an exemption.

The district court dismissed plaintiffs' claim that the exemption

process constituted an unconstitutional prior restraint on speech. MTD Op.

32-37 [JA 834-39]. Their renewed arguments on that score in this Court

provide no basis for the preliminary injunction they now seek. Plaintiffs'

characterization of the exemption process as "an unconstitutional speech-

licensing regime," Appellants' Br. 38, fails on multiple levels. As an initial

matter, the exemption process relates to the prohibition on circumvention,

which as discussed above does not restrict speech but instead restricts

conduct. The exemption process thus in no respect "provides a mechanism

for would-be speakers to seek government permission to speak," *id.*

Even apart from its focus on conduct rather than speech, the

exemption process is not a licensing regime in any relevant sense. The

Librarian does not consider applications by individuals who seek advance

permission to engage in particular activities (much less to engage in

speech), but rather engages in a "rulemaking proceeding" to identify

certain categories of circumvention that will be exempt from the statutory

46

prohibition.  *See* 17 U.S.C. § 1201(a)(1)(C).  Individuals seeking to take advantage of the exemptions need not seek approval from the government or prove to the government's satisfaction that their proposed conduct falls within the exempted categories.  The creation of rules of general application through a notice-and-comment rulemaking proceeding is not a licensing regime.

It is therefore unsurprising that, as the district court recognized, the exemption process raises none of the concerns associated with speech-licensing regimes.  The government is not making individualized determinations at all, and thus plainly does not have "unconfined authority to pass judgment on the content of speech."  *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 320 (2002), *cited in* MTD Op. 34 [JA 836].  And as discussed above, even the categorical determinations that the government is making echo the fair-use inquiry, and thus permissibly attempt to identify the statute's effect on uses that would not infringe the copyright laws, rather than passing judgment on the content of a potential speaker's message.

### E. Plaintiffs do not advance their argument by invoking the speech of third parties not before the court.

Plaintiffs briefly assert that they should be able to rely on the statute's alleged "harm to filmmakers, educators, people with disabilities, media critics, and countless other speakers," in support of an overbreadth challenge. Appellants' Br. 37. In district court, plaintiffs' overbreadth challenge was dismissed on the ground that it was not significantly different from their as-applied claim. *See* MTD Op. 31 [JA 833]. That holding was correct, as plaintiffs' overbreadth claim fails for largely the same reasons as their as-applied challenge.

In any event, "[i]nvalidation for overbreadth is strong medicine that is not to be casually employed." *United States v. Williams*, 553 U.S. 285, 293 (2008) (quotation marks omitted). A statute may be struck down as facially overbroad under the First Amendment only if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quotation marks omitted). Here, even apart from the fact that claims by other parties not before the Court would suffer from many of the same flaws as plaintiffs' claims, the statute's

48

permissible applications to restrict unlawful access and copying of copyrighted works make clear that the "strong medicine" of overbreadth is not appropriate. And the claims of third parties on which plaintiffs seek to rely largely arise from disputes about the Librarian's determinations regarding exemptions rather than exposing any flaw in the statutory scheme.

## II. The statute does not create an exception for circumvention associated with fair use.

Plaintiffs seek, in the alternative, to support the injunction they seek by arguing that their proposed uses are fair uses and that the statute should be read "to provide for a fair use defense by affirming that a person may be considered to have the requisite 'authority of the copyright owner' when their use of the copyrighted work at issue is non-infringing and therefore authorized by copyright law." Appellants' Br. 46 (quoting 17 U.S.C. § 1201(a)(3)). Thus, while plaintiffs mistakenly urge that the statute is unnecessary in light of copyright law, *see supra* Part I.C.1, it is plaintiffs who seek to render the statute entirely duplicative of copyright law. Both the statute's text and the legislative context show that Congress did not

mean merely to mirror copyright protection, but rather to provide a new form of protection tailored to the digital age.

Most directly, Congress defined "circumvent a technological measure" to mean "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."  17 U.S.C. § 1201(a)(3)(A).  The statutory term "authority of the copyright owner" thus refers to authority to access the work despite the technological measure, rather than authority (express or implied) to use or reproduce the accessed work in a particular way.  As noted above, the prohibition on unlawful access was novel and not derived from any provision of copyright law.  *See* S. Rep. No. 105-190, at 12.  And the statute's proviso that it does not "affect rights, remedies, limitations, or defenses to copyright infringement, including fair use," 17 U.S.C. § 1201(c), by its terms, addresses only the possibility that the Act would affect actions for copyright infringement, and not the converse question of whether defenses to copyright infringement have any relevance to liability under the Act.

In addition, through the exemption process, the Librarian of Congress is directed to identify categories of users who are likely to be "adversely affected by virtue of [the anti-circumvention prohibition] in their ability to make noninfringing uses."  17 U.S.C. § 1201(a)(1)(B).  If the statute already excluded circumvention to facilitate noninfringing uses, there would be no need for exemptions.  The statute's text and legislative history make clear that the exemptions were designed as the mechanism to ensure that certain noninfringing uses would remain viable, but through a more narrow approach than plaintiffs advocate.

In *Corley*, the Second Circuit declined to read the statute as categorically inapplicable to circumstances where materials will be put to fair use, concluding that such an interpretation was "not only outside the range of plausible readings of the provision, but . . . also clearly refuted by the statute's legislative history."  273 F.3d at 443 & n.13; *see* H.R. Rep. No. 105-551, pt. 2, at 36 (1998) (noting that the triennial rulemaking proceeding is to serve as a "fail-safe" to "ensure that access for lawful purposes is not unjustifiably diminished").  The snippets of legislative history on which plaintiffs rely largely highlight the statute's limitation to obtaining

unauthorized access and do not suffice to show that large swaths of the statutory text and legislative history are beside the point.

Plaintiffs provide no plausible alternative reading of the statute's text and do not account for the degree to which their reading would render significant portions of the statute superfluous. Nor do the cases on which they rely support their position. In *Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178 (Fed. Cir. 2004), the Federal Circuit rejected the application of the Digital Millennium Copyright Act to a transmitter that operated a competitor's garage-door opener by evading one of the opener's security features. The court rejected, in particular, the theory that a manufacturer was "entitled to prohibit legitimate purchasers of its embedded software from 'accessing' the software by using it" and that the transmitter thus provided unauthorized "access" to the garage-door opener's computer software. *Id.* at 1202. Here, by contrast, plaintiffs do not merely seek to use the software associated with items they have purchased, but rather to examine the software and disable it to allow broader access to the copyrighted work than authorized. And *Chamberlain* expressly does not address plaintiffs' argument here. Rather, the court stated that it did "not reach the relationship between § 107 fair use and

violations of § 1201," and did not quarrel with the proposition that the Act

prohibits "fair uses . . . as well as foul," *id.* at 1198, 1199 n.14 (alteration in

original) (quoting *Universal City Studios, Inc. v. Reimerdes* 111 F. Supp. 2d

294, 304 (S.D.N.Y. 2000), *aff'd sub nom. Universal City Studios, Inc. v. Corley*,

273 F.3d 429).

Plaintiffs' reliance on *Lexmark International, Inc. v. Static Control

Components, Inc.*, 387 F.3d 522 (6th Cir. 2004), is similarly misplaced. Like

*Chamberlain*, *Lexmark* involved a claim that a competitor's product (in that

case, a toner cartridge) circumvented technological protection measures for

compatibility purposes, an issue far afield from this case. In addition, the

majority opinion simply held that no copyrighted work was protected by a

technological protection measure. *See id.* at 550 (noting that purchase of the

printer, rather than circumvention of a technological protection measure,

permitted access to the software in question). Even the concurring

opinions upon which plaintiffs rely do not support their position. The first

concurrence emphasized that, like in *Chamberlain*, there was no showing

that the circumvention was "for the purpose of accessing [software]

programs" as opposed to simply "ensuring that [the defendant's] own

cartridges would work with Lexmark's printers." *Id.* at 553 (Merritt, J.,

concurring).  And the second concurrence opined that trafficking a product to facilitate copying that constituted fair use could not satisfy the requirement of 17 U.S.C. § 1201(b)—which is not at issue here—that the product violate a "right of the copyright owner."  387 F.3d at 562 (Feikens, J., concurring in part and dissenting in part) (quoting 17 U.S.C. § 1201(b)).

The Ninth Circuit case cited by plaintiffs, like *Chamberlain*, did "not reach the relationship between fair use under § 107 of the Copyright Act and violations of § 1201."  *MDY Indus.*, 629 F.3d at 950 n.12.  To the extent any holding of that case is relevant here, it is the court's express rejection of the conclusion that a violation of the Digital Millennium Copyright Act must be premised on facilitating infringement.  *Id.* at 950-52.

## III.   The district court did not abuse its discretion in denying a preliminary injunction.

Plaintiffs' arguments regarding the remaining preliminary-injunction factors are largely premised on their mistaken arguments regarding the benefits of the Digital Millennium Copyright Act and its effects on protected speech.  *See supra* Part I.C.  As discussed above, the challenged provisions foster the digital marketplace and have only an incidental effect on protected speech.  The district court therefore did not abuse its

discretion in concluding that the remaining preliminary-injunction factors counseled against granting a preliminary injunction. The Court's decision properly allowed the important protections for digital copyrighted works to remain in effect.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*
SCOTT R. McINTOSH

 */s/ Daniel Tenny*
DANIEL TENNY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1838*
  *daniel.tenny@usdoj.gov*

MARCH 2022

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,545 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Daniel Tenny*
Daniel Tenny

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2022, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals for the District of Columbia Circuit by using the appellate

CM/ECF system.  Service will be accomplished by the appellate CM/ECF

system.

*/s/ Daniel Tenny*
Daniel Tenny

# ADDENDUM

## TABLE OF CONTENTS

17 U.S.C. § 1201 ................................................................................ A1

17 U.S.C. § 107 ................................................................................ A15

**17 U.S.C. § 1201**

## § 1201. Circumvention of copyright protection systems

(a) Violations regarding circumvention of technological measures.--

(1) (A) No person shall circumvent a technological measure that effectively controls access to a work protected under this title. The prohibition contained in the preceding sentence shall take effect at the end of the 2-year period beginning on the date of the enactment of this chapter.

(B) The prohibition contained in subparagraph (A) shall not apply to persons who are users of a copyrighted work which is in a particular class of works, if such persons are, or are likely to be in the succeeding 3-year period, adversely affected by virtue of such prohibition in their ability to make noninfringing uses of that particular class of works under this title, as determined under subparagraph (C).

(C) During the 2-year period described in subparagraph (A), and during each succeeding 3-year period, the Librarian of Congress, upon the recommendation of the Register of Copyrights, who shall consult with the Assistant Secretary for Communications and Information of the Department of Commerce and report and comment on his or her views in making such recommendation, shall make the determination in a rulemaking proceeding for purposes of subparagraph (B) of whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition under subparagraph (A) in their ability to make noninfringing uses under this title of a particular class of copyrighted works. In conducting such rulemaking, the Librarian shall examine--

(i) the availability for use of copyrighted works;

(ii) the availability for use of works for nonprofit archival, preservation, and educational purposes;

(iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research;

(iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and

(v) such other factors as the Librarian considers appropriate.

(D) The Librarian shall publish any class of copyrighted works for which the Librarian has determined, pursuant to the rulemaking conducted under subparagraph (C), that noninfringing uses by persons who are users of a copyrighted work are, or are likely to be, adversely affected, and the prohibition contained in subparagraph (A) shall not apply to such users with respect to such class of works for the ensuing 3-year period.

(E) Neither the exception under subparagraph (B) from the applicability of the prohibition contained in subparagraph (A), nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph.

(2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that--

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

(3) As used in this subsection--

(A) to "circumvent a technological measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner; and

(B) a technological measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

(b) Additional violations.--

(1) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that--

(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;

(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

(2) As used in this subsection--

(A) to "circumvent protection afforded by a technological measure" means avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure; and

(B) a technological measure "effectively protects a right of a copyright owner under this title" if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title.

(c) Other rights, etc., not affected.--

(1) Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title.

(2) Nothing in this section shall enlarge or diminish vicarious or contributory liability for copyright infringement in connection with any technology, product, service, device, component, or part thereof.

(3) Nothing in this section shall require that the design of, or design and selection of parts and components for, a consumer electronics, telecommunications, or computing product provide for a response to any particular technological measure, so long as such part or component, or the product in which such part or component is integrated, does not otherwise fall within the prohibitions of subsection (a)(2) or (b)(1).

(4) Nothing in this section shall enlarge or diminish any rights of free speech or the press for activities using consumer electronics, telecommunications, or computing products.

(d) Exemption for nonprofit libraries, archives, and educational institutions.--

(1) A nonprofit library, archives, or educational institution which gains access to a commercially exploited copyrighted work solely in order to make a good faith determination of whether to acquire a copy of that work for the sole purpose of engaging in conduct permitted under this title shall not be in violation of subsection (a)(1)(A). A copy of a work to which access has been gained under this paragraph--

(A) may not be retained longer than necessary to make such good faith determination; and

(B) may not be used for any other purpose.

(2) The exemption made available under paragraph (1) shall only apply with respect to a work when an identical copy of that work is not reasonably available in another form.

(3) A nonprofit library, archives, or educational institution that willfully for the purpose of commercial advantage or financial gain violates paragraph (1)--

(A) shall, for the first offense, be subject to the civil remedies under section 1203; and

(B) shall, for repeated or subsequent offenses, in addition to the civil remedies under section 1203, forfeit the exemption provided under paragraph (1).

(4) This subsection may not be used as a defense to a claim under subsection (a)(2) or (b), nor may this subsection permit a nonprofit library, archives, or educational institution to manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, component, or part thereof, which circumvents a technological measure.

(5) In order for a library or archives to qualify for the exemption under this subsection, the collections of that library or archives shall be--

(A) open to the public; or

(B) available not only to researchers affiliated with the library or archives or with the institution of which it is a part, but also to other persons doing research in a specialized field.

(e) Law enforcement, intelligence, and other government activities.--This section does not prohibit any lawfully authorized investigative, protective, information security, or intelligence activity of an officer, agent, or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with the United States, a State, or a political subdivision of a State. For purposes of this subsection, the term "information security" means activities carried out in order to identify and address the vulnerabilities of a government computer, computer system, or computer network.

(f) Reverse engineering.--

(1) Notwithstanding the provisions of subsection (a)(1)(A), a person who has lawfully obtained the right to use a copy of a computer program may circumvent a technological measure that effectively controls access to a particular portion of that program for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs, and that have not previously been readily available to the person engaging in the circumvention, to the extent any such acts of identification and analysis do not constitute infringement under this title.

(2) Notwithstanding the provisions of subsections (a)(2) and (b), a person may develop and employ technological means to circumvent a technological measure, or to circumvent protection afforded by a technological measure, in order to enable the identification and analysis under paragraph (1), or for the purpose of enabling interoperability of an independently created computer program with other programs, if such means are necessary to achieve such interoperability, to the extent that doing so does not constitute infringement under this title.

(3) The information acquired through the acts permitted under paragraph (1), and the means permitted under paragraph (2), may be made available to others if the person referred to in paragraph (1) or (2), as the case may be, provides such information or means solely for the purpose of enabling interoperability of an independently created computer program with other programs, and to the extent that doing so does not constitute infringement under this title or violate applicable law other than this section.

(4) For purposes of this subsection, the term "interoperability" means the ability of computer programs to exchange information, and of such programs mutually to use the information which has been exchanged.

(g) Encryption research.--

(1) Definitions.--For purposes of this subsection--

(A) the term "encryption research" means activities necessary to identify and analyze flaws and vulnerabilities of encryption technologies applied to copyrighted works, if these activities are conducted to advance the state of knowledge in the field of encryption technology or to assist in the development of encryption products; and

(B) the term "encryption technology" means the scrambling and descrambling of information using mathematical formulas or algorithms.

(2) Permissible acts of encryption research.--

Notwithstanding the provisions of subsection (a)(1)(A), it is not a violation of that subsection for a person to circumvent a technological measure as applied to a copy, phonorecord, performance, or display of

a published work in the course of an act of good faith encryption research if--

(A) the person lawfully obtained the encrypted copy, phonorecord, performance, or display of the published work;

(B) such act is necessary to conduct such encryption research;

(C) the person made a good faith effort to obtain authorization before the circumvention; and

(D) such act does not constitute infringement under this title or a violation of applicable law other than this section, including section 1030 of title 18 and those provisions of title 18 amended by the Computer Fraud and Abuse Act of 1986.

(3) Factors in determining exemption.--In determining whether a person qualifies for the exemption under paragraph (2), the factors to be considered shall include--

(A) whether the information derived from the encryption research was disseminated, and if so, whether it was disseminated in a manner reasonably calculated to advance the state of knowledge or development of encryption technology, versus whether it was disseminated in a manner that facilitates infringement under this title or a violation of applicable law other than this section, including a violation of privacy or breach of security;

(B) whether the person is engaged in a legitimate course of study, is employed, or is appropriately trained or experienced, in the field of encryption technology; and

(C) whether the person provides the copyright owner of the work to which the technological measure is applied with notice of the findings and documentation of the research, and the time when such notice is provided.

(4) Use of technological means for research activities.--

Notwithstanding the provisions of subsection (a)(2), it is not a violation of that subsection for a person to--

(A) develop and employ technological means to circumvent a technological measure for the sole purpose of that person performing the acts of good faith encryption research described in paragraph (2); and

(B) provide the technological means to another person with whom he or she is working collaboratively for the purpose of conducting the acts of good faith encryption research described in paragraph (2) or for the purpose of having that other person verify his or her acts of good faith encryption research described in paragraph (2).

(5) Report to Congress.--

Not later than 1 year after the date of the enactment of this chapter, the Register of Copyrights and the Assistant Secretary for Communications and Information of the Department of Commerce shall jointly report to the Congress on the effect this subsection has had on--

(A) encryption research and the development of encryption technology;

(B) the adequacy and effectiveness of technological measures designed to protect copyrighted works; and

(C) protection of copyright owners against the unauthorized access to their encrypted copyrighted works.

The report shall include legislative recommendations, if any.

(h) Exceptions regarding minors.--

In applying subsection (a) to a component or part, the court may consider the necessity for its intended and actual incorporation in a technology, product, service, or device, which--

(1) does not itself violate the provisions of this title; and

(2) has the sole purpose to prevent the access of minors to material on the Internet.

(i) Protection of personally identifying information.--

(1) Circumvention permitted.--Notwithstanding the provisions of subsection (a)(1)(A), it is not a violation of that subsection for a person to

circumvent a technological measure that effectively controls access to a work protected under this title, if--

  (A) the technological measure, or the work it protects, contains the capability of collecting or disseminating personally identifying information reflecting the online activities of a natural person who seeks to gain access to the work protected;

  (B) in the normal course of its operation, the technological measure, or the work it protects, collects or disseminates personally identifying information about the person who seeks to gain access to the work protected, without providing conspicuous notice of such collection or dissemination to such person, and without providing such person with the capability to prevent or restrict such collection or dissemination;

  (C) the act of circumvention has the sole effect of identifying and disabling the capability described in subparagraph (A), and has no other effect on the ability of any person to gain access to any work; and

  (D) the act of circumvention is carried out solely for the purpose of preventing the collection or dissemination of personally identifying information about a natural person who seeks to gain access to the work protected, and is not in violation of any other law.

(2) Inapplicability to certain technological measures.--This subsection does not apply to a technological measure, or a work it protects, that does not collect or disseminate personally identifying information and that is disclosed to a user as not having or using such capability.

(j) Security testing.--

(1) Definition.--For purposes of this subsection, the term "security testing" means accessing a computer, computer system, or computer network, solely for the purpose of good faith testing, investigating, or correcting, a security flaw or vulnerability, with the authorization of the owner or operator of such computer, computer system, or computer network.

(2) Permissible acts of security testing.--Notwithstanding the provisions of subsection (a)(1)(A), it is not a violation of that subsection for a person to engage in an act of security testing, if such act does not constitute infringement under this title or a violation of applicable law other than this

section, including section 1030 of title 18 and those provisions of title 18 amended by the Computer Fraud and Abuse Act of 1986.

(3) Factors in determining exemption.--In determining whether a person qualifies for the exemption under paragraph (2), the factors to be considered shall include--

(A) whether the information derived from the security testing was used solely to promote the security of the owner or operator of such computer, computer system or computer network, or shared directly with the developer of such computer, computer system, or computer network; and

(B) whether the information derived from the security testing was used or maintained in a manner that does not facilitate infringement under this title or a violation of applicable law other than this section, including a violation of privacy or breach of security.

(4) Use of technological means for security testing.--Notwithstanding the provisions of subsection (a)(2), it is not a violation of that subsection for a person to develop, produce, distribute or employ technological means for the sole purpose of performing the acts of security testing described in subsection (2), provided such technological means does not otherwise violate section (a)(2).

(k) Certain analog devices and certain technological measures.--

(1) Certain analog devices.--

(A) Effective 18 months after the date of the enactment of this chapter, no person shall manufacture, import, offer to the public, provide or otherwise traffic in any--

(i) VHS format analog video cassette recorder unless such recorder conforms to the automatic gain control copy control technology;

(ii) 8mm format analog video cassette camcorder unless such camcorder conforms to the automatic gain control technology;

(iii) Beta format analog video cassette recorder, unless such recorder conforms to the automatic gain control copy control technology, except that this requirement shall not apply until there

are 1,000 Beta format analog video cassette recorders sold in the United States in any one calendar year after the date of the enactment of this chapter;

(iv) 8mm format analog video cassette recorder that is not an analog video cassette camcorder, unless such recorder conforms to the automatic gain control copy control technology, except that this requirement shall not apply until there are 20,000 such recorders sold in the United States in any one calendar year after the date of the enactment of this chapter; or

(v) analog video cassette recorder that records using an NTSC format video input and that is not otherwise covered under clauses (i) through (iv), unless such device conforms to the automatic gain control copy control technology.

(B) Effective on the date of the enactment of this chapter, no person shall manufacture, import, offer to the public, provide or otherwise traffic in--

(i) any VHS format analog video cassette recorder or any 8mm format analog video cassette recorder if the design of the model of such recorder has been modified after such date of enactment so that a model of recorder that previously conformed to the automatic gain control copy control technology no longer conforms to such technology; or

(ii) any VHS format analog video cassette recorder, or any 8mm format analog video cassette recorder that is not an 8mm analog video cassette camcorder, if the design of the model of such recorder has been modified after such date of enactment so that a model of recorder that previously conformed to the four-line colorstripe copy control technology no longer conforms to such technology.

Manufacturers that have not previously manufactured or sold a VHS format analog video cassette recorder, or an 8mm format analog cassette recorder, shall be required to conform to the four-line colorstripe copy control technology in the initial model of any such recorder manufactured after the date of the enactment of this chapter, and thereafter to continue conforming to the four-line colorstripe copy

control technology.  For purposes of this subparagraph, an analog video cassette recorder "conforms to" the four-line colorstripe copy control technology if it records a signal that, when played back by the playback function of that recorder in the normal viewing mode, exhibits, on a reference display device, a display containing distracting visible lines through portions of the viewable picture.

(2) Certain encoding restrictions.--No person shall apply the automatic gain control copy control technology or colorstripe copy control technology to prevent or limit consumer copying except such copying--

(A) of a single transmission, or specified group of transmissions, of live events or of audiovisual works for which a member of the public has exercised choice in selecting the transmissions, including the content of the transmissions or the time of receipt of such transmissions, or both, and as to which such member is charged a separate fee for each such transmission or specified group of transmissions;

(B) from a copy of a transmission of a live event or an audiovisual work if such transmission is provided by a channel or service where payment is made by a member of the public for such channel or service in the form of a subscription fee that entitles the member of the public to receive all of the programming contained in such channel or service;

(C) from a physical medium containing one or more prerecorded audiovisual works; or

(D) from a copy of a transmission described in subparagraph (A) or from a copy made from a physical medium described in subparagraph (C).

In the event that a transmission meets both the conditions set forth in subparagraph (A) and those set forth in subparagraph (B), the transmission shall be treated as a transmission described in subparagraph (A).

(3) Inapplicability.--This subsection shall not--

(A) require any analog video cassette camcorder to conform to the automatic gain control copy control technology with respect to any video signal received through a camera lens;

(B) apply to the manufacture, importation, offer for sale, provision of, or other trafficking in, any professional analog video cassette recorder; or

(C) apply to the offer for sale or provision of, or other trafficking in, any previously owned analog video cassette recorder, if such recorder was legally manufactured and sold when new and not subsequently modified in violation of paragraph (1)(B).

(4) Definitions.--For purposes of this subsection:

(A) An "analog video cassette recorder" means a device that records, or a device that includes a function that records, on electromagnetic tape in an analog format the electronic impulses produced by the video and audio portions of a television program, motion picture, or other form of audiovisual work.

(B) An "analog video cassette camcorder" means an analog video cassette recorder that contains a recording function that operates through a camera lens and through a video input that may be connected with a television or other video playback device.

(C) An analog video cassette recorder "conforms" to the automatic gain control copy control technology if it--

(i) detects one or more of the elements of such technology and does not record the motion picture or transmission protected by such technology; or

(ii) records a signal that, when played back, exhibits a meaningfully distorted or degraded display.

(D) The term "professional analog video cassette recorder" means an analog video cassette recorder that is designed, manufactured, marketed, and intended for use by a person who regularly employs such a device for a lawful business or industrial use, including making, performing, displaying, distributing, or transmitting copies of motion pictures on a commercial scale.

(E) The terms "VHS format", "8mm format", "Beta format", "automatic gain control copy control technology", "colorstripe copy control technology", "four-line version of the colorstripe copy control

technology", and "NTSC" have the meanings that are commonly understood in the consumer electronics and motion picture industries as of the date of the enactment of this chapter.

(5) Violations.--Any violation of paragraph (1) of this subsection shall be treated as a violation of subsection (b)(1) of this section. Any violation of paragraph (2) of this subsection shall be deemed an "act of circumvention" for the purposes of section 1203(c)(3)(A) of this chapter.

**17 U.S.C. § 107**

**§ 107. Limitations on exclusive rights: Fair use**

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.